## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Toby Cooper, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:07-cv-01229 (EGS)) |
| | ) | |
| District of Columbia Lottery and Charitable | ) | |
| Games Control Board, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES

Defendants District of Columbia Lottery and Charitable Games Control Board

("DCLB"), Government of the District of Columbia, and the Office of the Chief Financial

Officer ("OCFO") (collectively "Defendants"), through the undersigned counsel and in

response to Plaintiff's Complaint, respond as follows[1].

    1.    With respect to the averments contained in paragraph "1" on page 2 of the

Complaint, Defendants deny that Plaintiff has complied with the administrative exhaustion

requirements of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.  Accordingly,

Defendants deny that the Court has subject matter jurisdiction over the Complaint.  The

allegation regarding Mr. Coleman's alleged termination cannot be responded to because it

purports to involve a personnel matter regarding a District of Columbia employee, which is

confidential.  Answering further, Defendants deny all other averments contained in the first

---

[1] Plaintiff's Complaint does not conform to the requirements of Rule 8(e) of the Federal Rules of Civil Procedure which requires each averment of the complaint to be "simple, concise and direct."  Because the averments are not laid out in separately numbered paragraphs, Defendants have numbered the paragraphs of the Complaint for easy reference and append a copy of the numbered paragraphs to the Answer as Exhibit A.

paragraph on page 2 of the Complaint, except that Defendants admit that Plaintiff is an African-American woman who was employed at the DCLB; that Plaintiff was terminated on July 18, 2006; and that Plaintiff made allegations of harassment to the Office of Congressman Albert R. Wynn's, and when those allegations were forwarded to OCFO, the District of Columbia Office of Human Rights (DCOHR) and The Office of Internal Security (OIS) within the District of Columbia Office of the Chief Financial Officer undertook an investigation.

2.    With respect to paragraph "2" contained on page 2 of the Complaint, Defendants admit Plaintiff was hired by Defendants on April 4, 2005 for the position of Special Assistant/DS 14.    Defendants have insufficient knowledge to confirm or deny Plaintiff's averments with respect to the nature of Plaintiff's alleged educational degrees, employment in Fortune 500 companies, and entrepreneurial and IT contractual experience, but admit that Plaintiff represented that she possessed such credentials.    Defendants deny all other averments contained in paragraph "2" on page 2 of the Complaint.

3.    Defendants deny all averments contained in paragraph "3" on page 2 of the Complaint.

4.    Defendants deny all averments contained in paragraph "4" on page 3 of the Complaint.

5.    Defendants lack sufficient information to admit or deny Plaintiff's averments regarding what she "found."    Plaintiff's averment regarding retaliation is a conclusion of law to which no response is required.    Defendants deny all other averments contained in the paragraph.

6.      Defendants admit that Plaintiff submitted a document to Congressman Wynn's office containing allegations similar to those contained in paragraph "6" on page 3. This document speaks for itself.

7.      Plaintiff's averment regarding Mr. Ogumbemi contained in paragraph "7" on page 3 of the Complaint, assumes as fact that Mr. Ogumbemi had an obligation to report the incident alleged in paragraph 6. Defendants deny that Mr. Ogumbemi had such an obligation. Defendants deny all other averments contained in paragraph "7" on page 3 of the Complaint.

8.      Defendants deny all averments contained in paragraph "8" on page 3 of the Complaint.

9.      With respect to the averments contained in paragraph "9" on page 3 of the Complaint, Defendants deny all averments, except Defendants admit that Defendant OCFO promptly investigated an oral complaint of sexual harassment made on behalf of Ms. Pointer.

10.     Defendants admit that they received a complaint concerning the allegations set forth in paragraph 10 of the complaint. Defendants deny all other allegations contained in paragraph "10" on page 4 of the Complaint.

11.     Defendants deny all averments contained in paragraph "11" on page 4 of the Complaint.

12.     Defendants lack knowledge sufficient to admit or deny Plaintiff's averments regarding her alleged conversation with Debra Scott. Defendants deny the remaining averments contained in paragraph "12" on page 4 of the Complaint.

13.     Defendants deny the averments contained in paragraph "13" on page 4 of the Complaint.

14.     Paragraph "14" on page 4 of the Complaint contains Plaintiff's speculations regarding Mr. Parsons' alleged failure to take appropriate action against Mr. Coleman, which Defendants have otherwise denied.  Defendants have insufficient knowledge to admit or deny the remaining averments contained in paragraph "14."

15.     Defendants deny the averments contained in paragraph "15" on pages 4-5 of the Complaint.

16.     Defendants deny the averments contained in paragraph "16" on page 5 of the Complaint.

17.     Defendants admit that Ms. Graham worked in the information technology department under Mr. Coleman.   Defendants lack information sufficient to admit or deny the other averments contained in paragraph "17" on page 5 of the Complaint.

18.     Defendants deny all averments contained in paragraph "18" on page 5 of the Complaint, except that Defendants admit that Ms. Jackson-Jones was the director of human resources at DCLB in 2004 and that Mr. Young and Ms. Michael are attorneys.

19.     Defendants deny the averments contained in paragraph "19" on page 6 of the Complaint.

20.     Defendants admit that Plaintiff's first year performance evaluation rated her unsatisfactory and in need of improvement, and that Lottery Board management proposed to place her on a performance improvement plan.  Plaintiff's averment regarding retaliation is a conclusion of law to which no response is required.  Defendants deny all other averments contained in paragraph "20" on page 6 of the Complaint.

21.     Defendants admit that Plaintiff appealed her performance review and performance improvement plan to Defendant OCFO.  Defendants deny all other averments contained in paragraph "21" on page 6 of the Complaint.

4

22.     Defendants admit that Defendant OCFO rescinded Plaintiff's performance review and performance improvement plan.  Defendants deny all other averments contained in paragraph "22" on page 6 of the Complaint.

23.     Defendants deny all averments contained in paragraph "23" on page 6 of the Complaint.

24.     Defendants admit Plaintiff alleged that her car was vandalized in the DCLB parking lot.  Following OIO policies, Ms. Michael referred Plaintiff's Complaint to OIO for investigation and informed Plaintiff that she would not be able to view surveillance tapes, because doing so violated OIO policies in an ongoing investigation.   Defendants deny all other averments contained in paragraph "24" on page 6.

25.     Defendants admit that Plaintiff attended an off site training course designed to improve her deficient performance.   Defendants further state that Plaintiff alleged that files were removed from her office and her allegations were referred to security.  Defendants deny all other averments contained in paragraph "25" on page 7.

26.     Defendants deny all averments contained in paragraph "26" on page 7.

27.     Defendants lack sufficient information to admit or deny what, if anything, Plaintiff was told regarding her background investigation.  Defendants deny the remaining averments contained in paragraph "27" on page 7.

28.     Defendants deny all averments contained in paragraph "28" on page 7.

29.     Defendants lack sufficient information to admit or deny whether Plaintiff wrote the e-mail she alleges in paragraph "29" on page 8.   Defendants deny all other averments contained in this paragraph.

30.     Defendants deny all averments contained in paragraph "30" on page 8.

31.     Defendants deny all averments contained in paragraph "31" on page 8.

32.     Defendants admit that they did not meet their transfer and sales goals in 2004 and that they did meet these goals in 2005. Defendants deny that they met this goal because of Plaintiff and deny all other averments contained in paragraph "32" on page 8.

33.     Defendants admit that OIO and OHR investigated Plaintiff's allegations of sexual harassment. Defendants deny all other averments contained in paragraph "33" on page 8.

34.     Defendants deny the averments contained in the first two sentences of paragraph "34" on page 9. Defendants admit that Plaintiff attended training in May of 2006 and that OIO and OHR conducted investigations based on Plaintiff's allegations against the named employee. Defendants lack sufficient information to admit or deny all other allegations contained in paragraph "34" on page 9.

35.     Defendants deny the averments contained paragraph "35" on page 9.

36.     The allegation regarding Mr. Coleman cannot be responded to because it purports to involve a personnel matter regarding a District of Columbia employee, which is confidential. Defendants deny all other averments contained in paragraph "36" on page 9.

37.     Defendants admit that Plaintiff was working at DCLB in June 2006. Defendants lack sufficient information to admit or deny what, if anything, Plaintiff was told regarding Mr. Coleman's absence from DCLB. Defendants deny all other averments contained in paragraph "37" on page 9.

38.     Defendants deny all averments contained in paragraph "38" on page 9.

39.     Defendants admit Plaintiff was terminated on July 18, 2006. Defendants deny all other averment contained in paragraph "39" on page 9.

40.     Defendants deny all averments contained in paragraph "40" on page 10 of the Complaint.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Court lacks subject matter jurisdiction over the Complaint.

### SECOND AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the applicable statute of limitations.

### FOURTH AFFIRMATIVE DEFENSE

At all times material to the Complaint, Defendants maintained and continues to maintain a policy prohibiting sexual harassment and retaliation in the workplace. The policy provides that any employee who believes that he or she has been the victim of harassment should promptly make a complaint to one or more designated officials so that the OCFO can conduct a prompt investigation and undertake prompt remedial action in the event the complaint is sustained. The policy prohibits retaliation against any employee solely based on making a complaint of unlawful harassment. Plaintiff received a copy of the policy and was trained to recognize and report behavior that violated the policy. Plaintiff failed to report any allegation of sexual harassment to Defendants until shortly after she was placed on notice that her performance was unsatisfactory and that she was subject to a 90-day performance improvement plan. Defendants followed their policy and promptly investigated Plaintiff's complaints. DCOHR issued a report based on its investigation concluding that Plaintiff's complaints of sexual harassment, hostile environment and retaliation were without merit.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff was terminated for legitimate, non-discriminatory reasons based upon her failure to meet legitimate, job-related performance requirements. Specifically, and without limitation Plaintiff was terminated for unsatisfactory work performance, insubordination, refusal to follow instructions and failure to work in a collaborative manner with colleagues and staff.

## SIXTH AFFIRMATIVE DEFENSE

Defendants DCLB and OCFO are non sui juris.

## SEVENTH AFFIRMATIVE DEFENSE

Defendants give notice that they intend to rely upon and utilize such other defenses as they become available or apparent during the course of discovery and hereby reserve the right to amend their Answer.

WHEREFORE, Defendants pray that the Court enter judgment:

1.    Dismissing all claims alleged in the Amended Complaint with prejudice;

2.    Granting Defendant its costs, including attorney's fees, incurred in this action; and

3.    Granting Defendant further relief as the Court may deem appropriate.

DATED: December 10, 2007       Respectfully submitted,

LINDA SINGER
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division


/s/ Kimberly Matthews Johnson
KIMBERLY MATTHEWS JOHNSON
Chief, Section 1
DC Bar No. 435163


/s/ Jack M. Simmons
JACK M. SIMMONS, III
Assistant Attorney General
DC Bar No. 925420
441 Fourth St., NW, Sixth Floor South
Washington, DC  20001-2714
(202) 724-6653
(202) 727-0431   (fax)
jack.simmons@dc.gov
Attorney for Defendant

And


 /s/ Marilyn Ginger McCauley
Mary E. Pivec (#4457601)
Marilyn Ginger McCauley (#478528)
Keller and Heckman LLP
1001 G Street, N.W.
Suite 500 West
Washington, DC  20001
202-434-4212
202-434-4646 Fax
pivec@khlaw.com
Attorney for Defendants

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on December 10, 2007, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system and served by First

Class mail upon:

Toby Cooper
43333 Crystal Lake Street
Leesburg, VA  20176

/s/ Marilyn Ginger McCauley
Marilyn Ginger McCauley

# EXHIBIT A

United States District Court

For the District of Columbia

Toby Cooper

43333 Crystal Lake St.

Leesburg, VA 20176

Ph: 703-443-9045

VS.

Civil Action No.

District of Columbia Lottery and Charitable Games Control Board

2100 Martin Luther King Jr. Avenue, S.E.

Washington, DC 20020-5731

Washington D.C. Government

Mayors Correspondence Unit

1350 Pennsylvania Ave., NW

Room 221

Washington, DC 20004

Case: 1:07-cv-01229
Assigned To : Sullivan, Emmet G.
Assign. Date : 7/9/2007
Description: Employ. Discrim.

Office of the Chief Financial Office

441 4th St. N.W.

Suite 1150N

Washington, DC 20001

## COMPLAINT

① I, Toby Cooper, am an African-American women that was employed as at        D.C. Lottery and Charitable Games Control Board (DCLB). As an executive in the agency. I experienced sexual harassment from Erich Coleman, and witnessed inappropriate behavior throughout the agency. I spoke out against the sexual harassment that took place against me, and others within the agency. At least (3) other women that worked at DCLB, came forward and confirmed inappropriate behavior conducted towards them by Mr. Coleman. I also spoke out against the retaliation that took place against me, and the retaliation that took place against other employees for speaking out against DCLB's illegal practices. I submitted a written report, against the sexual harassment and retaliation and submitted it to DC OHR (DC Office of Human Right), and DC OIO (DC Office of Integrity and Oversight). Within less than approximately (1) month after I submitted my reports, Mr. Coleman was fired. Upon Mr. Coleman being fired, my managers informed me that I would be fired for speaking our against them. Within less than six weeks after Mr. Coleman was fired, I was wrongfully, and illegally terminated. My firing was retaliatory, and is illegal. It is specifically a violation of my civil rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. & 2000e, District of Columbia Human Rights Act, DC Code 2-1401- 01;        This court has jurisdiction, and the power to hear the complaint. I have exhausted my administrative remedies by taking my case to the DCOHR, (DC Office of Human Rights), and EEOC (Equal Employment Opportunity Commission). DCOHR took no action on my case. It has been over (6) months since the case has been with EEOC, and they have taken no action on the case. I have requested a Notice or right to Sue from EEOC. EEOC has informed me that the Notice of Right to Sue letter is pending. Once I received it, I will amended this complaint, and attach the Notice of Right to Sue to this complaint. (See attachment B)

② In April 2005 I was hired as the third highest level executive in the executive office. I was hired to assist the DCLB to operate efficiently, and meet it's sales and transfer goals. I was hired as the 3rd most senior executive in the executive office. Jeanette Michael was the Executive Director at a DS-16 level, Jay Young was the Chief Operating Officer at a DS-15 level, and I was brought in as an executive with the title of Special Assistant at a DS-14 level. I hold an M.B.A. in Information Technology, I held several positions in Fortune 500 companies. I am a graduate of General Edmonds, Information Technology Palace Acquire Program at the Pentagon. I founded my own IT (Information Technology) firm, and won numerous contracts including fiber optic wiring and cabling contracts for the Fedex Stadium, and Verizon Center. I brought excellent experience and business expertise to DCLB, and implemented my business skill, at DCLB.

Shortly after starting work at DCLB I was approached by Mr. Erich Coleman, the IT Director. Mr. Coleman began sexually harassing me.

③

1) He told me he was "looking for a little company", and that his wife had not relocated to this area with him. I told him I was not interested.

2) Mr. Coleman fondled my thigh under the dinner table at the University of the District of Columbia Gala. I told him to never tough me again. Mr. Coleman laughed.

3) Mr. Coleman threatened me at another fundraiser that his wife attended, stating "I better not say anything to her (his wife), or I would regret it. "

4) Mr. Coleman quoted my brassiere size to me, and stated he was talking about my bra size particularly. I Told him not to speak to me that way.

2

 4) As I continued refusing Mr. Coleman's advances, he became very hostile towards me.

 5) As a new executive I begun meeting other's in the agency and found out that several other women had been sexually harassed by Mr. Coleman, and that these persons had reported the sexual harassment. Some of these women were retaliated against for speaking out. Many women, and men that witnessed the sexual harassment refused to speak out for fear that they would be fired. The women that spoke out are listed below:

 1) TONYA SILLS: In February 2005, Mr. Coleman approached Tanya Sills from behind. While standing close against her back he blow on her ear and neck, and ran his hands through her hair. Mr. Coleman did this in the presence of a senior staff member, Mr Ogumbemi, the Chief of Networking Solutions in the IT department.

 Mr. Ogumbemi did not report Mr. Coleman's inappropriate behavior, and he did nothing to defend or assist Tonya Sills. Tonya Sills reported this to DCLB's Executive Director , Jeanette Michael. Jeanette Michael refused to take any action against Mr. Coleman. Instead Mr. Ogumbemi and Erich Coleman retaliated against Tanya Sills by placing her on a performance improvement plan, approved by Jeanette Michael.

8) When I became aware of Tonya Sills issue, I addressed the matter to Jeanette Michael, and Jay Young. Jeanette Michael and Jay Young covered up for Mr. Coleman by stating that Tonya Sills was a liar, and that there were no grounds for her complaint. With the support of Jeanette Michael and Jay Young, Mr. Ogumbemi, and Erich Coleman continued retaliating against Ms. Sills forcing her to resign in the summer of 2005. I understand that Tonya Sills was so affected by Mr. Coleman's sexual harassment and retaliation, that she sought professional counseling.

 2) SHARRON POINTER: Mr. Coleman constantly addressed Ms. Pointer and other women inappropriately. He would often call them darling, baby, sweety, etc. Ms. Pointer complained of this to management in 2005. No action was taken against Mr. Coleman. On one occasion, Sharron Pointer put Mr. Coleman on speaker phone while Ms. Michael was in the room, so Ms. Michael could hear the inappropriate language that Mr. Coleman was using towards her. Supposedly Ms. Michael met with Mr. Coleman concerning the matter, however, ultimately nothing was done by Ms. Michael to correct Mr. Coleman's behavior.



10. Ms. Pointer also reported that Mr. Coleman fondled her back, and arm, and pulled her hair in a vendors meeting. Ms. Pointer told Mr. Coleman this behavior was inappropriate and unwanted. Ms. Pointer transferred to another location out of the DCLB location, so she would not have to be in the presence of Mr. Coleman.

11. At DCLB Mr. Coleman continued speaking to women inappropriately, and I witnessed it on numerous occasions. In October 2005, I heard Mr. Coleman address Carol Jackson-Jones, as "my darling, here's my little darling". These comments were made in front of a room full of senior executives. I reported Mr. Coleman's comments to Jeanette Michael. No corrective action was taken against Mr. Coleman.

12. 3) ARELLE ANDERSON: In October 2005 Mr. Coleman pinched and fondled Arrelle Andersons lower back/buttocks area in front of other staff, and Sr. staff member. A secretary that witnessed this was Debra Scott. Debra Scott telephoned me in the executive office, to report what she had witnessed. Also witnessing the incident was Sales Director Billy Parson. According to Debra Scott no one reprimanded Mr. Coleman, or reported his inappropriate actions.

13. Mr. Parson, an executive at DCLB witnessed Mr. Colemans' inappropriate behavior, but he did not report Mr. Coleman, nor did he do anything to defend Ms. Anderson, against Mr. Coleman's assault. Debra Scott told me, that after Mr. Coleman pinched and fondled Arrelle Anderson, he stated "I just can't help myself".

14. Once again an executive staff member, Mr. Parson, sat silent, and witnessed unlawful behavior, instead of taking appropriate action against Mr. Coleman. However I was not surprised about this behavior from Mr. Parson, because Mr. Parson was also involved in questionable behavior. Mr. Parson was having a sexual relationship with a secretary, Debra Scott, and he had other sexual relationships with his previous secretaries at DCLB. Mr. Parson initially lied to investigators concerning his relationship with Debra Scott. However he later admitted that he had lied, and that he was having a sexual relationship with Debra Scott.

15. Mr. Parson participated in covering up Mr. Coleman's' unlawful behavior. Jeanette Michael and Jay Young did not reprimand Mr. Coleman, or take any action against Mr. Coleman for his inappropriate

behavior, nor did they take any action against Billy Parson for covering up for Mr. Coleman's' inappropriate behavior.

(16)    This pattern of behavior of senior male staff of DCLB having sexual relations with staff at DCLB, openly making sexual remarks, openly touching and fondling women at DCLB, without any reprimand from Jeanette Michael and Jay Young set the foundation for men, such as Erich Coleman, to conduct himself inappropriately without any fear of reprimand.   It also instilled a hostile work environment at DCLB that was demeaning, and insulting to women.

(17)    4)   KARLA GRAHAM: Karla Graham told me she had also witnessed inappropriate behavior form Mr. Coleman, and a hostile work environment throughout DCLB.  Ms. Graham was a Chief in the Information Technology (IT) dept. under Mr. Coleman.  In March 2006, she submitted her resignation. Ms. Graham came to see me before she resigned and told me she was resigning because of the hostile work environment at DCLB. She also told me that she witnessed Mr. Coleman physically putting his hand over women's mouth when they spoke,  and fondling, and hugging women in the IT dept.  She stated he was very hostile towards her and the entire staff, and often yelled and shouted at the staff, She stated that she  was fearful of working with Mr. Coleman alone, or late in the evening. As a result of  this fear she changed her AWS (alternative work schedule) work hours to not have to be at DCLB late in the evening, alone with him.  Finally, Mr.  Graham told me that Mr. Coleman had made a sexual advances to her on one occasion, but she quickly put this his advances to a stop.

(18)    5)   In 2006, Carol Jackson-Jones told me that she was the director of Human Resources (HR) at DCLB in 2004 and 2005, before I started working here. She stated that DCLB had several complaints from women at DCLB addressing sexual harassment complaints against Erich Coleman during this time. She told me she took these complaints to Jay Young and Jeanette Michael to have Mr. Coleman dismissed. She told me that Jay Young went on a tirade, yelling at her and slamming his hand on the table. Carol Jackson-Jones told me that Jay Young told her in the presence of Jeanette Michael, that if she pursued firing Mr. Coleman based on these sexual harassment complaints,  he would resign and defend Mr. Coleman as his attorney, against DCLB. Jay Young and Jeanette Michael are both attorneys. Carol Jackson-Jones stated that Jeanette Michael did nothing to reprimand Jay Young, or support the dismissal of Mr. Coleman.

Carol Jackson-Jones told me that because of this threat from Jay Young, nothing was ever pursued against Mr. Coleman while she was the director of HR at DCLB.

(19) On numerous occasions I spoke to Jay Young and Jeanette Michael about Mr. Coleman's inappropriate behavior, and sexual harassment towards me and others. I requested that they reprimand, and or fire Mr. Coleman. I had meetings with Jay Young, and Jeanette Michael, and reported Mr. Coleman's inappropriate behavior towards me and others, to no avail. I was told by Jeanette Michael and Jay Young that I was the problem. I was told to stop talking about sexual harassment issues, and the hostile work environment at DCLB, I was told that I needed to go along with their management style, I was told I would be fired if I did not "learn to do things there way."

(20) Since I would not stop complaining, nor would I cover up or ignore the sexual harassment at DCLB, Jeanette Michael and Jay Young retaliated against me by giving me a poor evaluation and putting me on a performance improvement plan. For over 10 months of employment I had (a) never received a performance plan, to be evaluated against, (b) had never received any poor performance reviews from Jay Young or Jeanette Michael.

(21) However, now that I had spoken out against Mr. Coleman, Jay Young and Jeanette Michael falsified (3) different performance evaluations to discredit and find fault with me. I appealed the performance evaluation to Dr. Ghandi.

(22) Dr. Ghandi rescinded the performance evaluation, stating that the performance evaluation was not valid. The performance improvement plan (PIP), was also rescinded. I was also told that these records would be removed from my employment file.

(23) As I continued to complain about Mr. Coleman, I received further retaliation from management at DCLB. Listed below are some of the retaliatory actions endorsed and/or implemented by Jay Young and Jeanette Michael.

(24) 1) My car was vandalized (3) times in the parking lot a DCLB. My car was " keyed" according to DCLB *(see attachment c)* security. My car tires were punctured on the sidewalls on (2) separate occasions. I requested to see the surveillance tapes from DCLB security, and DCLB security told me I would be allowed to see them. However Jeanette Michael intervened and told me that she would never allow me to see the surveillance tapes. She also told me I should quit my job, and continued pressuring me to quit. She stated that she was

"going to get rid of me, like she did Phyllis." Phyllis was a previous employee that was removed from DCLB. I reported my car vandalism to the Metropolitan Police Dept.

 2) Although I had already been removed from the PIP (performance improvement plan) Jeanette Michael never informed me of this. Instead she sent me off site to training courses. While I was gone, my office files were confiscated. Someone entered my office and removed numerous files, concerning MUSL audits, and notes pertaining to mismanagement at DCLB. I reported this to DCLB security. No action was taken to recover the files.

 3) In the spring of 2006 Jay Young and Jeanette Young made an effort to instigate a physical confrontation. Jay Young approached me in a meeting with Jeanette Michael, and taunted a physical confrontation with me. Jay Young, (a very tall and large man) got up from his seat, walked over to where I was seated, leaned over me and placed his face very close to mine, while yelling and screaming at me, and waving his finger in my face. He was so close, that I could feel his saliva landing on my face. Under normal circumstances a person would defend themselves by physically pushing him away, and/or pushing his hand out of their face. But instead of doing either of these things, I pushed my chair back and away from him, stood up, and requested that he stop this behavior towards me, and requested that Jeanette Michael require him to stop doing this. Instead Jeanette Michael sat watching his tirade with approval, and encouraging this behavior.

 4) Management re-opened my background investigation to try to find grounds to dismiss me. I was told that nothing derogatory was found in my background investigation.

 5) At DCLB's 2006 at a senior strategic planning retreat Jay Young tried to intimidate me. He was writing on a white paper with a black pen, then he stopped, looked over at me, and started writing with a red pen on the white paper. He then stated something similar to, "I'm doing this Kappa" style. As he said this he nodded towards the table where Billy Parson and Erich Coleman were seated, and the three of them made a strange finger signal towards each other in acknowledgement. Jay Young openly did this in front of Jeanette Michael. Myself, and other staff in the meeting were offended by this comment from Jay Young.

 After the meeting I wrote an email to Jay Young questioning why he would say this at a DCLB strategic planning meeting. Since this was not a Kappa fraternity meeting. He excused it by stating that he was referencing the colors of the red pen, on the white paper.

 In reality, he was confirming what numerous staff had already stated. He was trying to intimidate me and other, and send a message. Supposedly Jay Young, Billy Parson, and several senior level men at DCLB were Kappa Alpha Psi fraternity brothers. As fraternity brothers they protected and covered up for one another.

 6) Finally, Jay Young and Jeanette Michael continued there retaliation by assigning me assignment with written guidelines stating that I was not allowed to work with any other departments, or people, within DCLB to complete my work assignments. I was completely ostracized, and all of DCLB staff refused to cooperate, or work with my on an assignment.

 During all of this, I continued performing very well, and completing all assignments tasked to me at DCLB. As a result of my performance, DCLB was able to meet their transfer goal and sales goal for the fiscal year that I worked there. They were not able to accomplish this the previous fiscal year, before I was hired. The major change that existed in the DCLB executive staff team that resulted in this turn around was me. I was the only new executive brought on board to improve DCLB operations, and my input resulted in DCLB not only meeting, but exceeding their sales and transfer goals.

 In March and April 2006 I was contacted by OIO the (Office of Integrity and Oversight), and OHR (Office of Human Rights), to investigate my complaints about DCLB. I reported Erich Coleman's sexual harassment towards me and other staff at DCLB; and DCLB's hostile work environment. I reported that my job had been threatened, and that Jay Young and Jeanette Michael told me that I would be fired for speaking out about these matters. I reported that Jay Young and Jeanette Michael were aware of Erich Coleman's sexual harassment before I was hired at DCLB, and the ongoing sexual harassment Mr. Coleman conducted towards me and others while I was working there, yet they refused to reprimand him, and continues to allow him to conduct this illegal behavior, and covered up for him. I also reported the retaliation I was suffering for speaking out.

8



(34) Jeanette Michael tried to continue the PIP plan even after it was rescinded by Dr. Ghandi. She did this by not telling me that the PIP was rescinded, and still requiring that I attend training that she requested under the PIP plan. She did this although she was already informed by Dr. Ghandi that the PIP was rescinded. I went to the training classes as required. I was in training for appx. 3 weeks during the majority of the month of May 2006. I later found out that during May 2006, OIO and OHR was conducting an investigation of Mr. Coleman based on the information I told them concerning Mr. Coleman sexually harassing me, and others at DCLB,

(35) According to OHR, Congressman Wynn's office requested that an investigation be conducted concerning the pervasive sexual harassment and hostile work environment at DCLB.

(36) In late May 2006 Mr. Coleman was fired from DCLB. I was informed that my complaints were validated by the investigations, and Mr. Coleman was found guilty of inflicting these egregious sexual attacks against me and other women at DCLB, and fired because of this inappropriate behavior.

(37) I returned to the office in early June 2006. When I returned to the office I was informed that Mr. Coleman was fired. I was specifically told that Mr. Coleman was fired based of me speaking out about Mr. Coleman's inappropriate behavior. Jay Young and Jeanette Michael stated to me I was going to be fired for "breaking ranks" with the executive team, and speaking out against them, Erich Coleman, Billy Parson, and other executives at the lottery. Within approximately six weeks after Mr. Coleman was terminated, I was wrongfully terminated.

(38) Having suffered through the sexual harassment, and retaliation I became ill and suffered emotional distress and physical illness. I obtained medical attention due to the excessive stress this situation imposed upon me.

(39) On July 11, 2006 an employment termination letter was written. I received the letter from Jeanette Michael and Morris Winn on July 18, 2006. This termination was illegal. I was terminated in retaliation for speaking out against sexual harassment at DCLB.



(see attch. A)

(40) Since I was fired, DC government has continued retaliation against me by making derogatory remarks to potential new employers that have contacted them concerning my previous employment at DCLB. This retaliation from DC government has hampering me from obtaining new employment. DC government has also retaliated against my company, Delle Data Systems, Inc. They have done this by refusing to grant it an LSDBE (Local Small Disadvantaged Business Entity) certification to conduct business in Washington, DC, although the company qualified for the certification through the waiver program. This retaliation from DC government has hampering my business from obtaining new contracts with DC government. This on going retaliation from DC government has caused me economic loss, physical and emotional damage, and damage to my professional reputation.

I pray for relief:

- I am requesting relief from the court as outlined below:

1) A lump-sum payment of $350,000.00

2) Mutually agreeable letter of recommendation; my employment record cleared of any wrongdoing; and the wrongful termination removed from my employment record.

3) Payment of my COBRA payments until I obtain new employment covering my benefits or for 18 months, whichever comes sooner.

4) Payment of $5000 for my professional development, continuing education, and or career or executive placement services.

5) The attorney's fees and costs that Ms. Cooper has expended in pursuing this matter.

6) Other compensatory and punitive damages relief as just and appropriate

- I am asking for a trial by jury

Best Regards,

Toby Cooper

43333 Crystal Lake St

Leesburg, VA 20176

10